<u>FORM A</u>

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

**RECEIVED**

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA

APR 18 2016

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

(Enter above the **FULL** name and inmate
number of the plaintiff or
plaintiffs in this action.) *spencer Pierce SR*

vs.                                                    **COMPLAINT**

*John P Sarcone      Jerry LoveJoy    micheal mc Taggart      Demand Jury trial
stephanie Cox      Trudy Simonson    Brady carney
Danial Voogt      Jereld Fisher      M. Tower
    Et.      unknown video Editor.    BRad youngbut
        Lorna Garcia      Mark mohr
        James Entreek1n
*

(Enter above the **FULL** name of each *Paulson*
defendant in this action.)

(**NOTE:** If there is more than one plaintiff, the information in parts I and II should be shown for EACH
plaintiff by name, using a separate sheet of paper.)

I.      Previous Lawsuits:

A) Have you begun other lawsuits is state or federal court dealing with the <u>same facts</u> involved in
this action or otherwise relating to your imprisonment?          ☐Yes    ☒No

B) If your answer to A is "YES", please answer the questions 1 through 7. (If there is more than
one lawsuit, describe the additional lawsuits on another sheet of paper, using the same outline.)

1.) Parties to this previous lawsuit: *no*

Plaintiffs:

Defendants:

2.) Court (If federal court, name the district; if state court, name the county.) *none*

3.) Docket Number:

4.) Name of Judge to whom case was assigned:

5.) Disposition, if known (for example: Was the case dismissed?  Was it appealed?  Is it still pending?)

6.) Approximate date of filing lawsuit:

7.) Approximate date of disposition:

II.    Place of confinement:

A) Is there a prisoners grievance procedure in this institution?
☒Yes       ☐No

B) Did you present the facts relating to your complaint in the state prisoner grievance procedure?
☐Yes       ☒No

C) If your answer is **Yes,**

1.) What steps did you take?

2.) What was the result?

If your answer was **No,** explain why not: *not a prison issue*

D) If there is no prison grievance procedure in the institution, did you complain to prison authorities?
☐Yes       ☒No

E) If your answer is **Yes:**

1.) What steps did you take?

2.) What was the result?

III.    Parties

(In item **A** below, place your name in the first blank and place your present address in the second blank.  Do the same for additional plaintiffs, if any.)

A) Name of Plaintiff: *Spencer Pierce*
   Address: *Po Box 316 ISP. FTMadison IA, 52627*

B) Additional Plaintiffs: *none*

(In item **C** below, place the full name of the defendant in the first blank, and his official position in the second blank, and his place of employment in the third blank. Use item **D** for the names, position, and places of employment of any additional defendants.)

C) Defendant:       is employed as       at *Cops and Polk County attorney.*

D) Additional Defendants:  *see attach Defendant List*

IV.     Jurisdiction

This complaint is brought pursuant to 42 U.S.C., § 1983, and jurisdiction is based on 28 U.S.C. § 1343 (c). Plaintiffs(s) allege(s) that the defendant(s) acted under color of state law with regard to the facts stated in part V of this complaint.
*Police and County attorneys, from Polk County.*

V.      **Statement of Claim**

(State here as briefly as possible the **FACTS** of your case. You **MUST** state exactly what each defendant personally did, or failed to do, which resulted in harm to you. Include also the names of other persons involved (for example, other inmates) and state the date and place of all events. Attach an extra sheet if necessary and write the heading **PART V CONTINUED** at the top of the sheet. Keep to the facts. Do not give any legal arguments or cite any cases.)

*See Continued. However, This is a claim where Plaintiff was Found guilty of murder. Polk county, Feb 26.2032. Plaintiff conviction overturen and Dismissed. Procedendo issued on Feb 24,2016 no.13-2004 ·Court of appeals of Iowa.*

VI.     Relief

(State briefly exactly what you want the court to do for you. Make no legal arguments. **Do not cite cases or statutes.**)
*Plaintiff seeks, compensatory and punitive Damage From Each Defendant. Each Defendant is being sued In their Individual and official-capacity.*

VII.    Statement regard Assistance in preparing this Complaint.

A) Did any person other than a named plaintiff in this action assist you in preparing this complaint?
☐ Yes   ☒ No

B) If your answer is **Yes**, name the person who assisted you.

C) Signature of person who helped prepare this complaint.

_____ *N/A* _____        _____
                    (SIGNATURE)                                 (DATE)

VIII.   **Signature(s) of Plaintiff(s)** *Spencer Pierce SR*

Signed this _*9*_ day of _*April*_  20 *16* .

_Spencer Pierce SR_

(Signature of Plaintiff)

Signatures of additional plaintiffs, if any:

Part V Continued

1983 claim

On June 7, 2013 Plaintiff was searched, handcuffed and placed inside an unmarked police van by officer Simonson. Defendant Simonson took plaintiff phone and keys. Simonson asked plaintiff what is his name, and what apartment he lives in. After Plaintiff answered, officer Simonson asked where is Deanna Hood. Plaintiff asked if he was free to go. Simonson said no, and that Detectives want to speak with Plaintiff. Plaintiff told Simonson that he don't want to speak with any cops and he wants a Lawyer. By this time several other officers arrive. Defendant officer Lovejoy and Defendant officer Paulson and Defendant officer Fisher. Gets Plaintiff keys from Simonson and let thenself into Plaintiff security door at Plaintiff apartment all the while Plaintiff is yelling from inside van that he don't give them approval to enter. Plaintiff is talking loud and yelling hopeing everything will be taped. In the front seat of the van, Plaintiff notice a mug shot of Deanna Hood and another male. Believed to have the last name of Spencer.

About 30 minutes later, Detective Youngblut and Detective Towers arrive. Plaintiff tells both Defendants that he don't want to talk and that he wants an attorney. Defendant Towers tells Plaintiff that he will charge the Plaintiff for interferely in their investigation if Plaintiff don't start answering question. Defendant Youngblut says, "why aren't you answering. we don't want you. we just want to no where Deanna Hood is at." Plaintiff tells Defendant to either read him his miranda or let him go. Defendant Youngblut takes Plaintiff phone from Simonson and tries to call Deanna Hood. when Youngblut can't get a hold of Deanna Hood. Defendants Youngblut, Towers and Simonson force Plaintiff inside of the apartment building. There's several officers inside the security door standing in front of my apartment that's Defendant Youngblut knock on the Door, Hearing The Cat Jump off The Sink. Defendant Youngblut starts trying to open the

over

locked door by using the Plaintiff Keys. Plaintiff yelled "It's the cops, Don't open, Make them get a warrant" Simonson yells to the other officers to Kick the Door In. Plaintiff then yells, "Flush the weed". It take a Few more minutes to Find the Right Key.

While they Extract Deanna Hood, youngblut and Tовres, Simonson In Lovejoy search Plaintiff apartment. Simonson go's inside Plaintiff pants thats on Plaintiff bed and get Plaintiff Driver License and give it to youngblut. Lovejoy Finds a Fort Desmoines Id of the plaintiff on the Plaintiff TV stand and also give it to youngblutt.

Plaintiff and Deanna Hood was taken to Police station. about 6 hours alater, youngblut and Tовres, come into the Interview Room and tell Plaintiff that he is under arrest For a Parole Violation For yelling Flush the weed. youngblut Reads me my Miranda Rights and ask me IF I want to talk. I tell him NO. However, youngblut and Tовre keep trying to Question me. Plaintiff tells him IF he got In got a tape Recorder Plaintiff will talk. youngblut go's in get tape Recorder [ see interview attach ] Plaintiff stops talking, In agree to go to Jail. Defendant's youngblut and Tовres and an unknown video Editor conspire to alter Evidence.

The Part of the video oF the First conversation took place was Cut out. Defendant Tовres and youngblut wrote In their Investigation Report Date 7/8/2013 15:20:45 Tовres writes "Miranda was Read to him at 1711 hours and he stated that he did not wish to speak with us. at one point Spencer did Reinitiate contact with us and stated that would like to talk to us. at 1726 hours he did Reinitiate by comments being made. at 1750, Miranda was Read to him again in which we went in and spoke to him very briefly."

Defendant youngblut Filed a Police Report 2013-1711, Clearly useing untrue statements. youngblut put In Police that Plaintiff told youngblut "Pierce admitted that Hood was Inside the apartment even though she

was not answering the door. Pierce went to the door of the apartment and provided keys to me to open the door, agreeing to allow entry into the apartment.'

Later In Deposition Youngblut made clear that Plaintiff was in cuffs, and Requested a Lawyer on first contact and never stated Hood was in the apartment. Youngblut also atmitted he Reinitiated contact after plaintiff Repeatly told him he wants a Lawyer.

On June 7 Defendant officer Garcia wrote up a Search Warrant application. Defendant Lorna Garcia, Sgt. Michael McTaggart, Detective James Entrekin Detective Brad youngblut and Polk county Attorney John Sarcone conspired to write up an application Based on False affidavits, deliberate False hoods. Reckless disregard for the truth and deliberate omitted material Facts. [see application]. also Defendant Brady Carney.

On Page 5, 2nd paragraph (Affidavit of Lorna Garcia) It states 'That Frye knew that the man was going buy or sell drug that night.] That is untrue. Frye was never to told a drug deal was going on.

Same Paragraph. [She overheard his conversation about arranging this drug deal and heard a Female voice in the background of some of the calls.] Frye stated in her Interview she only guess that it might be about drugs, and she didnt know what the Phone conversations where about.

Same paragraph [ The male, (Later Indentified as Robert Rokitniki) would not call 911 Immediately. He Instead called his sister (Later Indentified as Gigi Toporek) Instead. Frye was eventually able to use the phone to call 911 and the male (Rokitniki) dropped her off at Kum & Go where she made another 911 call.

Garcia omitted The suspicious behavior of both Frye and

p.4

Rok'tnik's. Frye first phone to 911, she gave a false address and name.
Frye and Rok'tniks' smoked methamphetamine inside the Winnebago, drove around
between 30 to 40 minutes, before Frye made the 2nd 911 call. Rok'tniks' dropped
Frye off and left town, before talking with the police.

Page 6 of application, 1st paragraph.
[ This affiant brought the found Samsung phone to the station and a contact
of Deanna Hood at 515-783-1970 was identified. ] That statement is a reckless
disregard for the truth. The phone contact his the name Deanna, not Deanna Hood
They do not know if they are the same person. During the ~~interview~~ interview they
learned that Mr. Harmon had an Ex girlfriend by the name of Deanna Hood. They thought
that the Deanna in the phone might be Deanna Hood not till they extract Deanna
Hood from Plaintiff apartment did they learn it was the same person.
Page 6 of application. 2nd paragraph.
[ Lund stated that Hood had left a handwritten note for Harmon on his door on
Sunday, 02 Jun 13 asking for Harmon to call her at 515-783-1970 in an urgent
manner. This note was found inside Harmon's apartment by Detective J. aaron
Entrekin. ] That statement is a deliberate falsehood. There is no letter.
page6 paragraph 6. Harding officer Brady Carney.
The entire section is untrue. a sworn deposition office Carney states
that he had never seen Deanna Hood nor Spencer Pierce in person prior
to June 7 2013. He stated he never observed Hood and Spencer in
the Dodge Durango. nor were there any controlled buys with Hood or
Spencer. [ see attached deposition of officer Carney. ]

P5

The Last para. of page 6. and First para of Page 7.

[ Pierce stated that he is the tenant in apt. #23 and that Deanna Hood was inside his apartment ] This statement is also a deliberate Falsehood.

also in the same above paragraph. [ Detective youngblut and Detective Towres arrived there and they Knocked on his apartment door. In doing so. Pierce yelled through the door to Hood "Flush the weed" Repeatedly. Pierce had a cell phone in his possession with the number 515-494-1215. Hood had a cell phone in her possession with the number 515-112-5403.

The application omits the Fact that there was a security door in Front and that they used Plaintiff Key's to enter the secured building. They also omit that they had the Keys in was opening the apartment door when Plaintiff yelled Flush the weed. They omit Plaintiff was in handcuff and already Requested a Lawyer.

Deposition of Brad youngblut oct 2 2013

P.114 Line 18. Q and do you recall in your initial conversations with Mr Pierce, which were outside of his apartment, that's the First time you met him. Correct?

A. yes

Q Did he ask For an attorney at that point?

A. He said he didn't want to talk without an attorney

Q okay. and after that he made that statement, then he was brought up to his apartment?

A. yes

Q Escorted by police in handcuffs?

A. yes

MR. Dunn. I'm done.

The 2nd para of page 7

[ since Hood and Pierce have been observed inside This Dodge Durango

p.6

by an officer and witnesses. It was impounded and towed to the police garage. ]
Plaintiff Durango was impounded on a falsehood.

The rest of the 2nd para speak about the surveillance video from Bindery 1 Inc.
What is om't is. Nothing distinct or identifying about the two individuals
on this video was presented in the search warrant application. also, neither a
confrontation between the two suspect individuals and Harmon nor the shooting
was caught by the surveillance cameras providing the footage.

The connection between the Plaintiff's Durango and the suspect SUV in the murder
investigation is, at best speculative. No license plate, make, model or any of the
identifying markers of the "light colored SUV" were obtained through the
surveillance videos from Bindery 1 inc. The applicant herself even indicated only
a resemblance between the two vehicles.

    The Last para of page 7 and first of page 8.
[ Hood and Pierre are living together, and have been both spotted together in
the Durango. all of this information indicates involvement by Pierre and Hood in
Harmon's murder. ]

Nothing prior to the warrantless search of Plaintiff's apartment corroborates
that Plaintiff and Hood is living together. It's not until after entry into Plaintiff
apartment is Ms. Hood's presence actually known. Not until after the search warrant's
issuance is any physical evidence linking Deanna Hood to Plaintiff's apartment
discovered.

Methamphetamine and marijuana was found in used against Plaintiff in the
murder trial. [Note There wasn't a motion to suppress for any of the search warrants
In this case ]

Without the false affidavit and deliberate falsehood, false arrest
and illegal seizure, There wouldn't been probable cause.

P. 7

June 10. Det. youngblut comes to the Polk county Jail. The Gaurds tell Plaintiff he has a Lawyer visit. When Plaintiff get to the visit Room. youngblut is waiting. Plaintiff Reminds youngblut that Plaintiff has repeatly said he Dont want to talk to the Cops. Defendant youngblut tells Plaintiff that If Plaintiff didnt give him someone to ~~state~~ Blame the Murder on. Plaintiff will be Charged. Plaintiff Refused, youngblut offer.

Jun 12. Defendent youngblut Doe's a 3rd Interview with Kimberly Frye.
youngblut Q. OK. define the voice you heard.

Frye A. Um I would say it was younger. I guess maybe black voice you know.
Youngblut. why black voice?

Frye. Because it Just It they dont talk Like me and you are talking. It was Like give me your stash Right now you know Kind of thing. Is Kind of what I heard.

youngblut. you Know that bad ass thug talk.

It's only after Plaintiff Refused to Frame someone. That Frye statement Change From hearing two male voices, to one black male. The two prior Interview Frye made. anything she spoke of a non-white person. she made it clear.


on June 13.
Entree Kin #4970. Det youngblut #4919. Det Garcia #4940. Mc Taggart # 4927. The mention Defendants enter into a conspiracy to violate Plaintiff Rights. without a warrant. They seize plaintiff Durang From G and S towing. Take the Durango to the Crime scene around midnight and Make several Recreation videos.
By Doing so. This causes spoliation of the Evidence. The defendants contaminated the Durango. Plaintiff wasnt allowed to compare the diet and Mud off the Durango to the Crime scene.

none of the Defendants were trained accident Reconstruction or Total station or anything Like that.

June. 14

Defendant Garcia sends a DCI Lab Request asking a specific Question "Please determine IF Image of Suspect Vehicle can be clarified to show more detail which may Lead to an Identification of a make and Model FoR this SUV." The Lab was not able to give a make or model.

The complete investigation was Negligence, and Reckless.

There was No gun shot Residue testing Done in this case.

Robert Rokisinski car wasn't searched. There was drug paraphernalia Found Inside his winnebago. The Cops allowed him to Keep. He was also allowed to keep the Keys to the victim storage trailer and allowed back In before the Cops Found out that money or Drugs was missing. There 1,700 dollars missing From the Victim. They never Looked In the trailer For the money because they allowed Friends Family and Mr Rokisinski to take all the property, Just a Few Days aFter the murder.

July 23 Preliminary Hearing Fecr 268032

Defendant youngblut Deliberatly give False testimony at plaintiFF Preliminary Hearing Det youngblut stated that the Durango in the Reenactment Video was a positive match to the vehicle in the surveillance Video. He based his confirmation on two things.

First. He states the vehicle in the surveillance video, and plaintiFF Durango used In the Reenactment video, both has an Extremely Large hitch with a large silver block.

2nd. They both Drive over bumps the same way.

Defendant youngblut also Leaens at a later date that PlaintiFF Durango didn't

P 9

have a trailer hitch on it at the time the murder took place. He retract his statement
and say. He was watching two copies of the Reenactment Video when he made the
wrong comparision.

August 20, 2013
Sometime around August 9. [Specific Don't Know] Det Youngblut had a K9 officer
search Plaintiff Durango while at Glad's towing. The K-9 Don't alert. The Durango
was already searched In the I Dent Garage on June 7 and June 8.
On August 20. Defendant Youngblut and Defendant Sheriff Deputy Mohr
deployed his K9 around Plaintiff Durango. It Don't alert. ~~sear~~ Without a search warrant
Both ~~sear~~ Defendant search the Interior of the Durango. Then they go under the
hood. The said they Find 2 Large Gray Plastic walmart sack's plus 6 Plastic bag's to
w/ meth Est 174 Grams In side the air Filter. They then put the Evidence back
and go get a search warrant. This evidence was used against Plaintiff In
murder trial. This Evidence was planted.
This Evidence was planted. They had it since June 7. It most likely planted after
the Reenactment Video. The Durango can't Be driven with all that In the air Filter.

Defendants county attorney Daniel C. Voogt, Stephanie Cox and John P. Sarcone
Defendant John P Sarcone had no probable cause to charge Plaintiff with
crime of Felony Murder. Defendant Mr. Sarcone Knew that without the False
affidavit, deliberate Falsehood there was no Evidence against Plaintiff.
Defendants Daniel C. Voogt and Stephanie Cox conspired to Violate
Plaintiff Due process to a Fair trail and process.
Defendant Voogt and Cox withheld Exculpatory Evidence. They
withheld the test Results of Tire cast Impression comparison of

P10

Plaintiff Durango and tire past at crime scene. The Request for Examination was sent on 4 Oct 2013 to DCI Lab. The Results would have helped exonerate plaintiff.

Defendants also withheld DCI Lab Results of Footwear casts that would have helped Exonerate plaintiff.

Also Finger Prints where Found on or on Plaintiff Durango that Didn't match plaintiff or plaintiff Co-defendant. The Defendant Voogt and Cox Refused to give the Location that the Prints where Found on the Durango.

Defendant Voogt and Cox Refused to comply with discovery Request and court order.

Plaintiff was arraigned on 8/29/13, trial was set for october 28, 2013. Plaintiff Nevered waived his Right to a speedy trial. On Sept 11 Plaintiff attorney Filed a "motion For Discovery." On Sept 19 the court Granted the motion.

The search warrant application wasnt made available until after the start of taking deposition on october 2, 2013.

On October 9, 2013 Defendant Cox and Voogt with on the Record at a deposition hearing that they'll start turning over Discovery Request that day, however, they still Refused up until trial to comply. They where trying to Force Plaintiff to waive his Rights to a speedy trial.

Defendant Voogt and Cox presented an altered Video tape to the Jury. The surveillance tape From Binkeey Z mg and Oasis store where both altered. The surveillance Video that was given to plaintiff and the video that the Defendants Voogt and Cox put into Evidence as Exhibits are not the same.

Neither Defendants would tell plaintiff who Edit the videos. NOR Did plaintiff have a Chance to have an Expert take a Look at the State's Videos Because it wasn't until trial that Plaintiff Learned this.

P11

[ note there was no suppression motion to suppress any of the search warrants ].

During the prosecution of this case [ all hearings ] The Defendants Dan Voogt and Cox ordered the Guards at the old Polk county Jail to Remove Plaintiff and his Co-Defendant away from the Rest of the Inmates. In take all of Plaintiff Legal papers, make a copie of them and give it the Defendant Voogt and Cox. Plaintiff made a record of thats while going to trial. The Material was attorney client confidential.

Defendant Voogt and Cox Knowing there was no Physical OR direct Evidence to place Plaintiff at the crime scene Knowingly, presented False and misleading testimony, at Plaintiff trial.

Defendant youngblut and Defendant Garcia testify that the suv in the surveillance video and Plaintiff Durango in the Reenactment Video where a match. neither Garcia OR youngblut gave a Reason For this opinion. It was only to place or try to place plaintiff at scene of crime. Its a grainy Black and white video taken at night.

Defendant Voogt and Cox made a strategic and tactical decision to try to place Plaintiff and the scene of the crime by using Racial stereotype and playing to the fears of the Jury.
Defendant Voogt Exame of Frye at trial.

Q. Descibe the voice you hear

A. Sounded Like slang you know younger people would use.

Q. Okay. Did you draw any other conclusions or opinions about the voice based on what was said and how it was said?

P12

A. Well, Sounded Like it was a male voice. I'd say younger Male, maybe middle age. But it's demanding they were Robbing him.

Q. Did you Reach any other opinion with Respect to the Race of the Person Speaking?

A. Yes. I assumed it was an African-American voice.

The Defendant Voogt wasn't going to allow Ms. Frye Leave that stand without bringing out the Race card.

Defendant Focused on putting on evidence that Plaintiff was a Black man who sold meth to white people and slept with white females. They understood the Racial disparities of the Iowa Justice system. So they played to that. They had no Reason believe that the ~~jury~~ the only would Find Plaintiff guilty Of the evidence, of Murder

Plaintiff is sueing each defendant In theire Individual and offical -capacity
    Defendant-List
        John P. Sarcone Polk county attorney        Officer Paulson cop Dmpd.
        Stephanie cox Polk county attorney
        Danial C. Voogt Polk county attorney
        Jerry Lovejoy #4844 cop Dmpd
        Trudy Simonson # 5073 cop Dmpd
        Jerald Fisher # 4803  cop Dmpd
        [ unknown Video Editor / Interview Video, Dmpd
        [ Lorna Garcia #4940  cop Dmpd
        Jame Entrekin #4970  cop Dmpd
        Michael Mc Taggart #4927 cop Dmpd
        Brady Carney #5015  cop Dmpd
        M. Tower #4941   cop Dmpd                    Jawen Pierce SR  4/9/2013
        Brad Youngblut #4969  cop Dmpd               AKA Fat Moses
        Polk County Deputy Mark Mohr.

ATTACHMENT A

Affiant: Lorna Garcia
Occupation: Senior Police Officer
Assignment: Criminal Investigations

No. years: 12
No. years: 5

*Your affiant conducted an investigation and received the following information:*

On 06/06/13 Des Moines Police dispatch received a call at 0140 hrs regarding a shooting victim at 1631 E. Aurora. The call came in from Kimberly Frye who had been at the address where the shooting occurred. Officer Phil Terrones and Officer Eric Morris picked up Frye from her location at the Kum & Co at 2140 Guthrie Ave. Frye directed the Officers and they located victim Steven Harmon. His body was between two semi trailers parked just west of the Iowa Storage Trailer Inc. building at 4100 E. 17th St. Harmon was obviously dead face down on the ground with an apparent gunshot wound with blood visible on his back. A shotgun shell casing was found nearby as well as small divot marks on the side of one of the storage trailers showing buckshot impact.

Frye was transported by Officer Terrones to the police station for questioning. In the interview with Detective Brad Youngblut and Detective Matt Towers, Frye stated that she was hanging out with Harmon at his apartment at 1207 E. Bell Ave. #25. Frye admitted to using methamphetamine with Harmon after meeting him a few days prior. Harmon suggested that they go for a ride to somewhere more private and Frye agreed to go. Harmon drove his truck to the area of 1631 E. Aurora Ave. where she had been with him once before. Harmon had a semi storage trailer parked there. Frye stayed inside the trailer where there was a couch. Harmon was using his phone and seemed to be communicating with someone a lot. Frye knew that Harmon was going to buy or sell drugs that night. Frye overheard Harmon comment that he would not go to the "hood" and state "I am at the trailer come to me". She overheard his conversations about arranging this drug deal and heard a female voice in the background of some of the calls. Frye said she did not know who Harmon was talking to. At some point, Harmon went outside to where he had parked his truck. She heard a vehicle pull up nearby, and heard Harmon arguing with two male voices outside. Then she heard two loud banging sounds which she thought was gunfire. After hearing the shots, she heard a vehicle drive away. She hid in the trailer for a short time, and did not see anyone since she was inside the trailer. Once she felt it was safe, she went out and saw Harmon was laying on the ground unresponsive with blood on him. Frye stated she didn't have a phone. So she ran out looking for someone with a phone. She then found a parked Winnebago camper nearby that she knew was occupied by an acquaintance of Harmon's. She pounded on the camper door and a male answered. The male, (later identified as *Robert Robimicki*), would not call 911 immediately. He instead called his sister (later identified as *Gigi Toporek*) instead. Frye was eventually able to use the phone to call 911 and the male (Robimicki) dropped her off at Kum & Co where she made another 911 call.

After speaking to Frye, this affiant went to Harmon's apartment at 1207 E. Bell Ave. #25. A key was obtained from the apartment manager who confirmed that Harmon was the listed tenant at this apartment. Inside the apartment, this affiant found Christopher Weckman sleeping on a

5

chair in the front room. Christopher was transported to the station for an interview. In his interview, Weckman confirmed Harmon's cell phone number to be *515-505-3277*. Samsung brand cell phone was found that was in obvious working order. With this information, records were requested from Harmon's cell phone provider in order to check his call history and find his last known contacts. This affiant then identified the found Samsung phone to the station and a contact of *Deanna Hood* at *515-788-1970* was identified. Harmon's phone records document several phone calls and text messages between Harmon and Hood. This communication abruptly ends after Harmon is killed.

This affiant drove to Blindey 1 Inc. at 1631 E. Aurora Ave to inquire about video cameras. This affiant was able to view the various surveillance cameras they have set up at the business. The video shows the vehicle entering the parking lot behind 1631 E. Aurora Ave. at approximately 2346 hrs on 06/05/13. About one hour later, the video shows a light colored SUV enter this same parking lot and go to the location where the shooting occurred. This SUV stays in this area for about five minutes and it shows at least two people getting back into the SUV just before driving away.

On 06/06/13 Detectives Matt Towers and Brad Youngblut interviewed Ryan "Rhino" Twisting at the station. He also confirmed Harmon's drug involvement. He mentioned Deanna Hood as a person that used to have an intimate relationship with Harmon, and who was at Harmon's apartment frequently.

Interviews were also conducted with Cory Greenford and Shelby Land who are friends and neighbors to Harmon. Both Greenford and Land confirmed seeing Deanna Hood at Harmon's apartment and that she was a associate of his. Land stated that Hood had left a handwritten note for Harmon on his door on Sunday, 02 Jun 13 asking for Harmon to call her at *515-788-1970* in an urgent manner. This note was found inside Harmon's apartment by Detective J. Aaron Estrukin. Greenford also observed Hood recently riding around in a silver Dodge Durango.

This affiant was informed that a person named Jason Owens had information about this case. This affiant picked him up at his home on 06/07/13 and interviewed him at the station. Owens said he was a good friend of Harmon, and I showed him a picture of Deanna Hood and he confirmed her name to me. He said that Hood used to date Harmon but they were just friends recently. He knew that she associated with Harmon and was at his apartment regularly as well.

Officer Brady Carney had been working with a case concerning drugs being brought to Rayco Construction in the 200 block of E. Aurora Ave. Officer Carney has observed Deanna Hood and a male known as "Spencer" in a silver Dodge Durango. This Durango was identified with Iowa plate AXA419. Controlled drug buys had been done with Hood proving her to be a drug supplier. A intelligence bulletin was put out in an effort to locate Deanna Hood since the vehicle could not be found at her last known addresses.

On 06/07/13, Officer Trudy Stannasan and Officer Gerald Lovejoy found the silver Dodge Durango with Iowa plate AXA419 parked at 2910 Arnold Rd. They observed Spencer Please

6

come out of the Durango and approached him. Pierce was identified and has a criminal history including the commission of a robbery. Pierce stated that he is the tenant in Apt. #23 and that Deanna Hood was inside his apartment. Detective Youngblut and Detective Towers arrived there and they knocked on his apartment door. In doing so, Pierce yelled through the door Hood "Hush the weed" repeatedly. Pierce had a cell phone in his possession with the number 515-494-6265. Hood had a cell phone in her possession with the number 515-612-5403. Hood and Pierce were transported to the police station for interviews.

Since Hood and Pierce have been observed inside this Dodge Durango by an Officer and witnesses, it was impounded and towed to the police garage. A light colored SUV is observed in the surveillance video from Bindley 1 Inc. as the obvious suspect vehicle in this case. The silver Dodge Durango seems similar to the SUV seen on the video footage, and therefore may provide physical evidence in this case.

Hood was interviewed by Detective Youngblut and Detective Towers. She acknowledged having a romantic relationship with Harmon in his past and that he is currently a friend. She claimed that her cell phone with the number 515-783-1970 had been stolen on the afternoon of 06/03/15. She also said that she went to Harmon's apartment at dark to talk to Harmon. She then went home to 2910 Arnold Rd. #23 where her boyfriend Pierce lives and went to bed at 0200 hrs. When questioned further, she requested a lawyer and the interview ended.

Pierce was also interviewed at the station by *Detective Youngblut* and *Detective Towers*. Pierce was read his Miranda rights and decided not to speak to Detectives.

Detective J. Aaron Entwisler contacted Kathy Bradshaw who is the owner of Arnold Arms Apartments at 2910 Arnold Rd. Kathy confirmed that Spencer Pierce is the tenant at 2910 Arnold Rd. Apt. 23 in Des Moines, Iowa.

Based on my training and experience I know that those involved in criminal activity as well as the victims of crime will often have evidence of association on their cellular telephones. This information can include telephone numbers, telephone log information, photographs, audio, video, text messages, e-mail, call information, evidence of incoming/outgoing calls, and any evidence of social media such as Facebook, Twitter accounts or information. I also know that cellular phones can be located and tracked by way of cellular phone tower information as well as geolocate or GPS data.

This affiant is also aware that trace DNA evidence is often left at crime scenes. Buccal swabs to obtain DNA evidence can be used for comparison purposes if such trace evidence is collected from the scene.

A relationship between Harmon and Deanna Hood was confirmed by several witnesses as well as Hood herself. Harmon and Hood both were known to buy and sell drugs, and Harmon was setting up a drug transaction before his death. Hood's cellular phone number is on Harmon's phone records repeatedly showing multiple communications between them before his death. Hood makes no attempts to contact Harmon after his death, which may indicate that she knew of

167

his death already. Hood and Pierce are living together, and have been both spotted together in the Durango. All of this information indicates involvement by Pierce and Hood in Harmon's murder.

I know that the address is accurately described in the "PROPERTY OR PERSON(S) TO BE SEARCHED" section of this application because:

- The description(s) came from another police officer, specifically, Brad Youngblut and Matthew Towers.
- The description(s) came from the Polk County Assessor's web site.

I know that the vehicle is/are accurately described in the "PROPERTY OR PERSON(S) TO BE SEARCHED" section of this application because:

- The description(s) came from Department of Transportation (D.O.T.) records listing vehicles registered to Erikly Anderson.

I know that the person(s) is accurately described in the "PROPERTY OR PERSON(S) TO BE SEARCHED" section of this application because:

- The description(s) came from Department of Transportation (D.O.T.) records listing the description associated with this/these person(s).

Images (photographic, videotaped and/or electronically) of the interior and/or exterior of the address and vehicle searched as requested in this application are relevant to this investigation to document the places searched, the condition of the places searched at the time they were searched and to document the location of any items seized.

- Moreover, because the location is believed to be a crime scene, images of this location are relevant to show the scene of the crime at this stage of the investigation. As the investigation develops, the appearance of the scene may take on new significance unknown at this time.

Images (photographic, videotaped and/or electronic) of any item(s) seized as requested in this application are relevant to this investigation to document the condition and location of the items seized at the time they were seized.

Evidence of ownership and/or control of the address and vehicle searched pursuant to this search warrant is relevant to show who had access to and/or was or is in possession and control of any relevant items seized.

168

FILED
POLK COUNTY, IA.
2013 JUN 10 AM 9:29
CLERK DISTRICT COURT

## APPLICATION FOR SEARCH WARRANT

I, the undersigned, being duly sworn, state that I have reason to believe that at the place(s) and/or on the person(s) and/or in the vehicle(s) described as follows, I believe there is property and/or person(s) listed below. Such item(s) are seizable because:

### PROPERTY OR PERSONS TO BE SEARCHED

• *Address, described as follows.*
  o 2910 Arnold Rd., #23, Des Moines, Polk County, Iowa. 2910 Arnold Rd. Apt. #23, Des Moines, Iowa is a brick, multi-unit apartment building located on the south side of Arnold Rd. Apartment 23 is located on the second floor of the building on the southwest end of the building and has the number "23" on the wood door. This includes any and all outbuildings associated with the address, above or below ground storage structures associated with the address, and/or curtilage associated with this specific address or property.

FILED
POLK COUNTY, IA.
2013 JUN 10 AM 9:29
CLERK DISTRICT COURT

• *Vehicle, described as follows.*
  o 2000 silver Dodge Durango bearing Iowa plate AXA419, VIN: 1B4HS28Z3YF110782 registered to Brialy Anderson, 821 Hickman Rd., Des Moines, Iowa.

• *Persons, described as follows.*
  o Deanna Marie Hood, WF27, DOB 04/19/86, 5'01", 111 pounds, 600-28-38__.
  o Spencer Antowyn Pierce, BM28, DOB 11/13/66, 5'10", 275 pounds, 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.

### ITEM(S) OR PERSON(S) SOUGHT

• Images (photographic, videotaped and/or electronic) of the interior and/or exterior of the address and vehicle searched pursuant to this search warrant.
• Images (photographic, videotaped and/or electronic) of any item(s) seized pursuant to this search warrant.
• Evidence of ownership and/or control of the address and/or vehicle searched pursuant to this search warrant.
• Any and all cellular phones, including but not limited to phones with the numbers 515-612-5403 and 515-494-6265.
• Firearms and ammunition including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons and any records or receipts pertaining to firearms and ammunition.
• All gun related evidence and accessories to include gun cases, ammunition, clips and magazines, and gun scopes.
• Any and all blood evidence and/or blood stain evidence,

• Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier checks, passbooks, bank checks, lease agreements, loan records, documents and/or keys relating to safety deposit boxes and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.
• Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.
• Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchase and/or distribution of controlled substances.
• United States Currency, precious metals, jewelry and financial instruments including, but not limited to, stocks and bonds.
• Indicia of occupancy, residency and/or ownership of the premises described above including, but not limited to, utility and telephone bills, canceled envelopes, keys, lease agreements and mortgage records, loan records, documents and/or keys relating to safety deposit boxes.
• Methamphetamine and marijuana as listed in Chapter 124.401 of the State Code of Iowa, as well other paraphernalia, instrumentalities, or documents which are evidence of the illicit possession, use, dealing or distribution in controlled substances. Precursors, solvents, reagents, glassware, and tubing consistent with the illicit manufacture of methamphetamine.
• Safes, lockboxes and/or any other portable securable container(s).
• Buccal swabs to obtain DNA from Deanna Hood and Spencer Pierce.

### APPLICATION APPROVAL

I have read and approved this application and request that a search warrant be issued.

_____
Assistant Polk County Attorney

The facts establishing the grounds for issuance of a search warrant are as set forth in the attachment made a part of this application.

_____
Police Officer

Sworn to before me this 7th day of June, 2013

_____
Judge of the Fifth Judicial District of Iowa

FILED
POLK COUNTY, IA.
2013 JUN 10 AM 9:29
CLERK DISTRICT COURT

Polk County, Iowa
Police Agency: Des Moines Police Department

Police Case Number: 2013-16913

To     Jerry Critzhni Nee:

# SEARCH WARRANT

## POLK COUNTY, IOWA
### TO ANY PEACE OFFICER IN THIS STATE

Proof has been made before me, as provided by law, that the property and/or persons listed herein are at the locations listed below. You are hereby commanded to make an immediate search of any property and/or persons and if the property or any part thereof is found you are commanded to take such items into custody and you are directed to bring a list of said property before me at my office.

### PROPERTY OR PERSONS TO BE SEARCHED

- **Address, described as follows.**
  - o 2910 Arnold Rd., #23, Des Moines, Iowa. 2910 Arnold Rd. Apt. #23, Des Moines, Iowa is a brick, multi-unit apartment building located on the south side of Arnold Rd. Apartment 23 is located on the second floor of the building on the southwest end of the building and has the number "23" on the wood door. This includes any and all outbuildings associated with the address, above or below ground storage structures associated with the address, and/or curtilage associated with this specific address or property.

- **Vehicle, described as follows.**
  - o 2000 silver Dodge Durango bearing Iowa plate AXA419, VIN: 1B4HS28Z6XYF110782 registered to Eristy Anderson, 821 Hickman Rd., Apt B Des Moines, Iowa.

- **Persons, described as follows.**
  - o Deanna Marie Hood, W/27, DOB 04/19/86, 5'01", 111 pounds, 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.
  - o Spencer Antwoyn Pierce, BM/28, DOB 11/13/06, 5'10", 275 pounds, 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.

### ITEMS OR PERSONS SOUGHT

- Images (photographic, videotaped and/or electronic) of the interior and/or exterior of the address and vehicle searched pursuant to this search warrant.
- Images (photographic, videotaped and/or electronic) of any item(s) seized pursuant to this search warrant.
- Evidence of ownership and/or control of the address and/or vehicle searched pursuant to this search warrant.
- Any and all cellular phones, including but not limited to phones with the numbers 515-612-8403 and 515-494-6265.
- Firearms and ammunition including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons and any records or receipts pertaining to firearms and ammunition.

-1-

- All gun related evidence and accessories to include gun cases, ammunition, clips and magazines, and gun scopes.
- Any and all blood evidence and/or blood stain evidence.
- Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier checks, passbooks, bank checks, lease agreements, loan records, documents and/or keys relating to safety deposit boxes and other items evidencing the obtaining, securing, transfer and/or concealment of assets and the obtaining, securing, transfer, concealment, and/or expenditure of money.
- Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.
- Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchase and/or distribution of controlled substances.
- United States Currency, precious metals, jewelry and financial instruments including, but not limited to, stocks and bonds.
- Indicia of occupancy, residency and/or ownership of the premises described above including, but not limited to, utility and telephone bills, cancelled envelopes, keys, lease agreements and mortgage records, loan records, documents and/or keys relating to safety deposit boxes.
- Methamphetamine and marijuana as listed in Chapter 124.401 of the State Code of Iowa, as well other paraphernalia, instrumentalities, or documents which are evidence of the illicit possession, use, dealing or distribution fo controlled substances. Precursors, solvents, reagents, glassware and tubing consistent with the illicit manufacture of methamphetamine.
- Safes, lockboxes and/or any other portable secureable container(s).
- Buccal swabs to obtain DNA from Deanna Hood and Spencer Pierce.

### SUCH ITEMS ARE SOUGHT BECAUSE:

- They were obtained in violation of the law.
- They are illegally possessed.
- They are/were used or possessed with the intent that the item(s) be used to commit or conceal a public offense.
- They are relevant and material as evidence in a criminal prosecution or investigation.

Dated this 7th day of June, 2013.

_[signature]_
Judge of the Fifth Judicial District of Iowa

-2-

## DEPOSITION OF BRADY CARNEY

**Page 1**

```
 1        IN THE IOWA DISTRICT COURT FOR POLK COUNTY
 2   STATE OF IOWA,
 3            Plaintiff,        )  NOS. FECR 268031
                               )       FECR 268032
 4   vs.                        )
                               )  DEPOSITION OF
 5   DEANNA M. HOOD and         )  BRADY CARNEY
     SPENCER A. PIERCE,         )
 6                              )
 7            Defendants.       )
 8        THE DEPOSITION OF BRADY CARNEY,
 9   taken before Jodi Conley, Certified Shorthand Reporter
10   and Notary Public of the State of Iowa, commencing at
11   10:03 a.m., Wednesday, October 9, 2013, at Room 288,
12   Polk County Jail, Des Moines, Iowa.
13            A P P E A R A N C E S
14   Plaintiff by:        DAN VOOGT
                          STEPHANIE COX
15                        Assistant County Attorneys
                          206 Sixth Avenue
16                        Des Moines, Iowa 50309
17   Defendant Spencer A. Pierce by:
                          JASON DUNN
18                        Attorney at Law
                          401 East Court Avenue
19                        Suite 150
                          Des Moines, Iowa 50309
20
     Defendant Deanna M. Hood by:
21                        F. JOHN SPELLMAN
                          Attorney at Law
22                        2635 Hubbell Avenue
                          Des Moines, Iowa 50317
23
24   Also present:        Spencer Pierce and Deanna Hood
25
```

**Page 2**

```
 1            I N D E X
 2
 3   WITNESS                             PAGE
 4   BRADY CARNEY
 5    Direct Examination by MR. DUNN . . . . .    3
 6    Cross-Examination by MR. SPELLMAN. . . .   15
 7    Redirect Examination by MR. DUNN . . . .   20
 8
 9
10
11        (No exhibits were marked during this
12        deposition.)
13
```

**Page 3**

```
 1                      BRADY CARNEY,
 2   called as a witness, having been first duly sworn,
 3   testified as follows:
 4                   DIRECT EXAMINATION
 5   BY MR. DUNN:
 6   Q.   Can you state and spell your name for the record,
 7   please?
 8   A.   Brady Carney, B-r-a-d-y, C-a-r-n-e-y.
 9   Q.   How are you employed?
10   A.   Des Moines Police Department.
11   Q.   And in what capacity?
12   A.   I'm currently in the vice and narcotics control
13   section.
14   Q.   And what are your job duties as an officer in the
15   vice and narcotics section?
16   A.   As a narcotics investigator, we do all sorts of
17   vice and narcotics investigations, obviously involving
18   illegal drugs, vice laws within the city, and we do some
19   undercover capacity, and we manage confidential
20   informants as well.
21   Q.   How long have you been on vice and narcotics?
22   A.   Since July of 2012.
23   Q.   And prior to that what were your duties with the
24   DMPD?
25   A.   Uniform patrol officer.
```

**Page 4**

```
 1   Q.   For how long?
 2   A.   Approximately five years.
 3   Q.   And prior to joining the Des Moines Police
 4   Department, did you have any other law enforcement
 5   experience?
 6   A.   No.
 7   Q.   And did you have any other educational training?
 8   A.   I have a four-year degree in criminal justice from
 9   Iowa State University.  Then I attended the Des Moines
10   Regional Police Academy.
11   Q.   And is DMPD your first job?
12   A.   Yes, it is.
13   Q.   In law enforcement?
14   A.   Correct.
15   Q.   Okay.  Officer; right?
16   A.   Sure.
17   Q.   Okay.  Tell me what your involvement was in the
18   death investigation of Steven Harmon to start with.
19   A.   On the 7th of June, just prior to 10 p.m., I was
20   contacted by Sergeant Kress, who's with the persons unit
21   stating that they had performed a search warrant for 2910
22   Arnold Road, Apartment No. 23.  He had stated that
23   illegal narcotics were located inside that apartment.
24        After being contacted by Sergeant Kress,
25   officer Hochstetler, who's another narcotics
```

## DEPOSITION OF BRADY CARNEY

**5**

1  investigator, and myself responded to that apartment.
2  Q.    And prior to getting that phone call, did you know
3  who lived in that apartment?
4  A.    No.
5  Q.    And prior to getting that phone call, did you know
6  who either Deanna Hood or Spencer Pierce was?
7  A.    Yes.
8  Q.    Tell me about that. How did you know who they
9  were?
10 A.    I had received information on them approximately a
11 month to a month and a half prior about their involvement
12 in selling methamphetamine and distributing it in the
13 city of Des Moines.
14 Q.    And outline for me what information was given to
15 you.
16 A.    That they were supplying Rayco Construction, which
17 is at 208 East Aurora, with methamphetamine, and they
18 were involved or supposedly driving a silver Dodge
19 Durango.
20 Q.    At any time prior to going over to the house where
21 the drugs were found during that search warrant, did you
22 have a conversation with Detective Garcia?
23 A.    Not that I recall.
24 Q.    Okay. Did you provide her information about your
25 investigation into either Ms. Hood or Mr. Pierce?

**6**

1  A.    Yes, I did. I did speak with her.
2  Q.    Okay. And when was that?
3  A.    I don't remember the exact date. It was prior to
4  going over to the apartment, though.
5  Q.    Okay. And did you have an ongoing investigation
6  of Ms. Hood and Mr. Pierce prior to going to that
7  apartment on that day?
8  A.    Yes.
9  Q.    And did you have any controlled buys between
10 either Ms. Hood or Mr. Pierce prior to the date you went
11 over to that apartment?
12 A.    Not specifically from them.
13 Q.    What information did you have with regards
14 to -- other than people telling you that they were
15 involved in narcotics, what personal information or
16 observation did you have about them in the sale of
17 narcotics?
18 A.    The vehicle that they were associated with had
19 been observed at Rayco Construction multiple times.
20 Q.    And when you say that they were alleged to be
21 providing drugs to Rayco Construction, was there a
22 certain person there that was buying drugs from them
23 or --
24 A.    That I don't know. There were multiple people who
25 would regularly hang out at that place.

**7**

1  Q.    Is that a known drug hang-out?
2  A.    Yes, it is.
3  Q.    Okay. So to your knowledge, was it just the --
4  and what vehicle was associated with Ms. Hood and
5  Mr. Pierce?
6  A.    A silver Dodge Durango.
7  Q.    Do you know who that vehicle was registered to?
8  A.    I can't pronounce her first name, but she's known
9  as Tina Anderson.
10 Q.    Do you have any prior involvement with
11 Ms. Anderson?
12 A.    I did not.
13 Q.    Did you know what her past criminal record was at
14 all?
15 A.    Yes, I did.
16 Q.    And what was it, if you remember?
17 A.    I don't recall all of it, but I do know that she
18 had been arrested for a drug-related charge, I believe it
19 was prescription pills.
20 Q.    So prior to going to the apartment to confiscate
21 or take possession of the drugs, did you have any pending
22 controlled buys with either Ms. Hood or Mr. Pierce or any
23 controlled buys in the past between a CI, yourself, or
24 either of them?
25 A.    There were no controlled buys directly from either

**8**

1  Ms. Hood or Mr. Pierce.
2  Q.    It was just that their vehicle was seen at Rayco?
3  A.    Correct. I had been working on other avenues and
4  investigation to determine exactly who they were and
5  where they were coming from, but I did not have
6  directly -- or controlled buys directly from them.
7  Q.    So was the fact that there was a search warrant
8  with regards to a homicide investigation and there
9  happened to turn up drugs obviously helpful in your
10 investigation of them?
11 A.    It corroborated information that I had been
12 receiving, yes.
13 Q.    Okay. And you stated that their vehicle was --
14 had been seen at Rayco. Had either one of them been seen
15 at Rayco or just the suspect vehicle?
16 A.    I did not see them there.
17 Q.    Do you know anyone that did?
18 A.    I received information from multiple people that
19 they were, indeed, there.
20 Q.    Any document or would these be --
21 A.    No.
22 Q.    -- other informants?
23 A.    Yes.
24 Q.    And then based on your taking possession of the
25 drugs at the apartment, were charges filed against

# DEPOSITION OF BRADY CARNEY

**9**

1  Ms. Hood and Mr. Pierce?
2  A.    On Mr. Pierce they were, yes.
3  Q.    Okay.  And what were -- so charges weren't filed
4  on Ms. Hood?
5  A.    Not initially.
6  Q.    And were charges later filed on her then?
7  A.    Yes, they were.
8  Q.    And what were those charges?
9  A.    Possession with intent of methamphetamine, no tax
10  stamp, and possession with intent of marijuana.
11  Q.    And those charges were just based on the drugs
12  that were seized from the apartment?
13  A.    Correct.
14  Q.    And had you -- did you know what Ms. Hood or
15  Mr. Pierce looked like prior to the day you went over to
16  the apartment to seize the drugs?
17  A.    Yes.
18  Q.    Did you see them in person or did you just see mug
19  shots of them?
20  A.    Pictures of them.
21  Q.    Okay.  So you yourself had no -- any prior
22  personal contact with them?
23  A.    No.
24  Q.    And were you aware that Mr. Pierce was on parole?
25  A.    Yes.

**11**

1  vehicle.
2  Q.    And did he indicate to you why he was doing that?
3  A.    He stated that he had received information that
4  led him to believe there were still drugs in that
5  vehicle.
6  Q.    Were you there when the vehicle was searched?
7  A.    Yes.
8  Q.    Okay.  And can you tell me exactly where those
9  drugs were found?
10  A.    Underneath the air filter cover, which is under
11  the front hood of the Dodge Durango.
12  Q.    And were they easy to find?
13  A.    No.
14  Q.    How hard was it to locate those drugs?
15  A.    I removed metal -- lifted the hood up first,
16  removed metal snaps from the air filter cover, removed
17  the cover, and then there's a filter.  Picked up the
18  filter, and the bags containing meth were underneath
19  that.
20  Q.    And how was that meth packaged?
21  A.    In plastic -- clear plastic baggies.
22  Q.    And what condition were they in?
23  A.    It was meth inside of plastic baggies.  It was --
24  Q.    Did the plastic baggies look clean or dirty or
25  like they had been in an engine for a couple months, or

**10**

1  Q.    And based on that information, you didn't try
2  to -- did you try to have any discussions with his parole
3  officer or anyone involved in his parole supervision with
4  regards to your suspicion?
5  A.    I did not.
6  Q.    Do you know why?
7  A.    Yes.
8  Q.    Why?
9  A.    We have not had particularly good luck with that
10  in the past.  If I do not personally know them, I do not
11  divulge an ongoing investigation with them or, depending
12  on the information we have, we don't give that out.
13  Q.    Okay.  Were you involved in the reconstruction
14  that took place of the taking the suspect vehicle out to
15  the bindery corporation and reconstructing the prior film
16  surveillance video?
17  A.    No.
18  Q.    Do you know what I'm talking about?  Okay.  I
19  didn't word that very well.  And then can you tell me
20  briefly what led you to file for another search warrant
21  on that Dodge Durango and subsequently search that in
22  August of this year?
23  A.    I did not file for the search warrant.  Detective
24  Youngblut did.  And Detective Youngblut contacted me
25  stating that he was preparing a search warrant for that

**12**

1  do you have any recollection of what they looked like?
2  A.    They were clear plastic baggies with meth.  There
3  was nothing that stood out about them.
4  Q.    And I'm assuming someone took pictures of this?
5  A.    Yes.
6  Q.    Okay.  So the information that you have -- you
7  didn't have any direct knowledge that Mr. Pierce or
8  Ms. Hood were actually at Rayco Construction.  Just this
9  suspect vehicle Dodge Durango was?
10  A.    Correct.  I did not see them there.  I just
11  received reports that they were showing up there and
12  distributing meth to the construction business.
13  Q.    Okay.  When did you first become interested in
14  this silver Dodge Durango that we're talking about?
15  A.    I would say sometime in May.
16  Q.    And were you provided then with a license plate
17  number for that car?
18  A.    Yes.
19  Q.    And then did you run it?
20  A.    Yes, I did.
21  Q.    And how were you able to discover who was -- who
22  was allegedly driving around with that vehicle?
23  A.    I was provided with their names first, then a
24  vehicle description, and then the license plate number.
25  Q.    And this information was provided to you by

## DEPOSITION OF BRADY CARNEY

**13**

1  informants?
2  A.    Yes.  Just to add to one prior question.  Ms. Hood
3  was directly seen at Rayco Construction when she was
4  arrested and the charges were filed against her.  That's
5  where she was located was in the driveway at 208 East
6  Aurora.
7  Q.    That's where you made the arrest?
8  A.    Yes.
9  Q.    Was she under surveillance prior to that arrest or
10  how did you come across her?
11  A.    Yes, she was.
12  Q.    And after -- and on what date was that, if you
13  recall?
14  A.    I do not recall.
15  Q.    Sometime after she had been interviewed with
16  regards to the homicide?
17  A.    I don't know.  I did not speak with her.
18  Q.    Okay.  And did you interview her after the arrest?
19  A.    Yes.
20  Q.    And what information did she provide to you?
21  A.    She stated that she did know Spencer Pierce.  That
22  she had been staying on and off with him at Arnold Road
23  at Apartment No. 23.  She had, indeed, been to Rayco
24  Construction multiple times prior to that.
25  Q.    Did she admit to using methamphetamine?

**14**

1  A.    Yes, she did.
2  Q.    Did she admit to selling methamphetamine?
3  A.    No, she did not.
4  Q.    And at this time you talked to her, Spencer Pierce
5  was in custody.  Were you aware of that?
6  A.    Yes.
7  Q.    Did you do any monitoring of either one of their
8  phone calls while they were in custody?
9  A.    Yes, I did.
10  Q.    And what phone calls did you listen to?
11  A.    I don't recall specifically.
12  Q.    What information did you gather from listening to
13  those phone calls that assisted you in your case against
14  either one of them?
15  A.    Nothing specifically.
16  Q.    You don't recall how many phone calls you listened
17  to?
18  A.    No, I don't.
19  Q.    Do you remember when the last one you listened to
20  was?
21  A.    No.
22  Q.    Okay.  And prior to Ms. Hood's arrest, she had
23  been under surveillance?
24  A.    Occasionally, yes.
25  Q.    And had she been observed to be selling or dealing

**15**

1  narcotics during that time of surveillance, if you
2  recall?
3  A.    No.
4  Q.    Okay.  And was there a warrant for her arrest when
5  you arrested her?
6  A.    Yes.
7  Q.    Is that why you arrested her?
8  A.    Yes.  And she also had pending charges from the
9  search warrant on Arnold Road.
10        MR. DUNN:  Okay.  I don't have any further
11  questions.
12            CROSS-EXAMINATION
13  BY MR. SPELLMAN:
14  Q.    I understand that you were receiving some general
15  information that Mr. Pierce and Ms. Hood were delivering
16  drugs to Rayco.  Did you have any specifics as to
17  quantities, to whom, how much?
18  A.    Multiple ounces to a variety of people.
19  Q.    And at Rayco?
20  A.    Some of the time, yes.
21  Q.    Did your information tell you whether it was
22  Spencer Pierce or Deanna Hood that was delivering the
23  drugs?
24  A.    Yes.
25  Q.    Which one?

**16**

1  A.    Both of them.
2  Q.    Sometimes Deanna would hand the drugs over and
3  sometimes Spencer would hand the drugs over?
4  A.    Yes.  They were both knowingly involved together.
5  Q.    You say multiple times.  Can you elaborate on
6  that?  Do you have any specific numbers?
7  A.    I don't know specifically.
8  Q.    Did you receive any specifics from these
9  individuals as to who was driving the Durango when it
10  would go to Rayco?
11  A.    No, not specifically who was driving.
12  Q.    Did you receive any specifics as to who was paid,
13  whether it was Deanna or Spencer that was paid when these
14  deliveries were made?
15  A.    That I don't know.
16  Q.    Did any of your information reveal that either
17  Spencer Pierce or Deanna Hood was violent during these
18  deliveries?
19  A.    No.  I did not receive that specific information.
20  Q.    Apparently that all these deliveries went
21  smoothly.  There was no problems?
22  A.    There was no mention of it.  I can't say one way
23  or another.
24  Q.    You've never seen either one of these individuals,
25  Mr. Spencer or Ms. Hood, drive that Dodge Durango?

17

1   A.   I have not.

2   Q.   And you never made any controlled buys from Deanna

3   Hood or Spencer Pierce?

4   A.   Correct.

5   Q.   And you've never seen either one of these two

6   individuals in the 2000 silver Durango?

7   A.   I have not.

8   Q.   Has Detective Hochstetler, that you know of, ever

9   seen these two individuals?

10  A.   Not that I'm aware of.

11  Q.   When you arrested Deanna Hood, she was at Rayco or

12  in the driveway?

13  A.   She had just arrived at Rayco Construction.

14  Q.   Alone, with someone?

15  A.   She was with Matthew Hartford.

16  Q.   Who was driving?

17  A.   Mr. Hartford was.

18  Q.   And were they just sitting there when you

19  approached the vehicle?

20  A.   No. They had just pulled in when we approached

21  the vehicle.

22  Q.   You didn't conduct a traffic stop or anything

23  or ---

24  A.   Yes. A marked patrol unit was there and did

25  initiate a traffic stop at the request of us.

18

1   Q.   But based on the arrest warrant?

2   A.   Yeah. I believe it was out of Jasper County, she

3   had an arrest warrant for her, and we had charges ready

4   to be filed when she was located.

5   Q.   You had not filed them at that time?

6   A.   I had not requested a warrant for her. I had the

7   charges in hand.

8   Q.   Okay. When you arrested her, did she have any

9   illegal drugs on her?

10  A.   She did not have any illegal drugs. She did have

11  a meth pipe with residue.

12  Q.   Where was that located?

13  A.   Between the passenger seat and the door along the

14  floor of the car.

15  Q.   Did she make any statements to you regarding that

16  pipe?

17  A.   She did.

18  Q.   What did she tell you?

19  A.   That she stated she knew it was in the vehicle.

20  She did claim that the pipe was hers, and she did admit

21  to using methamphetamine on prior occasions.

22  Q.   Was that the end of the conversation?

23  A.   No.

24  Q.   What other information did she provide you

25  substantively regarding illegal drug use and/or

19

1   delivering the same?

2   A.   She did not make any statements regarding

3   delivering methamphetamine. The conversation revolved

4   around her knowing Spencer Pierce, her living with

5   Spencer Pierce, her living with Spencer Pierce at 2910

6   Arnold Road No. 23, and then her association with Rayco

7   Construction and Mr. Hartford.

8   Q.   What did she tell you about Rayco?

9   A.   That she had been there. She was going to see

10  Mikey, who is known to be Michael Ray who is associated

11  with Rayco Construction.

12  Q.   It's his family's business, I take it?

13  A.   I believe so, yes.

14  Q.   When you arrested her, did she have any cash on

15  her?

16  A.   She did not.

17  Q.   What about Matt?

18  A.   Yes, he did.

19  Q.   How much?

20  A.   I don't recall a specific amount, but it was

21  seized.

22  Q.   Was it a substantial amount?

23  A.   I would say yes.

24  Q.   Ballpark. Can you estimate how much it was?

25  A.   I believe around 700 to a thousand dollars, but I

20

1   don't recall specifically.

2        MR. SPELLMAN: That's all I have. Thank you.

3        MR. DUNN: I've got a couple.

4        REDIRECT EXAMINATION

5   BY MR. DUNN:

6   Q.   Detective, did you know who Steven Harmon was

7   prior to June 6, 2013?

8   A.   No.

9   Q.   His name wasn't on any of your -- wasn't on your

10  radar as someone who dealt methamphetamine?

11  A.   No.

12  Q.   Are you aware, was he on anyone in your unit's

13  radar? Had you ever heard his name before?

14  A.   I had not.

15        MR. DUNN: Thank you.

16        MS. COX: Nothing from us. Thanks.

17        (Deposition concluded at 10:25 a.m.)

18

19

20

21

22

23

24

25

**DEPOSITION OF BRADY CARNEY**

21

1               C E R T I F I C A T E

2

3

4        I, the undersigned, a Certified Shorthand Reporter
   and Notary Public of the State of Iowa, do hereby certify
5  that there came before me at the time, date, and place
   hereinbefore indicated, the witness named on the caption
6  sheet hereof, who was by me duly sworn to testify to the
   truth of said witness' knowledge touching and concerning
7  the matters in controversy in this cause; that the
   witness was thereupon examined under oath, the
8  examination taken down by me in shorthand, and later
   reduced to typewriting under my supervision and
9  direction, and that the deposition is a true record of
   the testimony given and of all objections interposed.

10

11       I further certify that I am neither attorney nor
   counsel for, or related to or employed by any of the
12  parties in the action in which this deposition is
   taken, and further that I am not a relative or employee
13  of any attorney or counsel employed by the parties
   hereto, or financially interested in the action.

14       Dated at Des Moines, Iowa, this 9th
   day of October, 2013.

15

16

17

18       _____
           Certified Shorthand Reporter
19         and Notary Public of the State of Iowa

20

21

22

23

24

25

21

1                    C E R T I F I C A T E

2

3

4         I, the undersigned, a Certified Shorthand Reporter
     and Notary Public of the State of Iowa, do hereby certify
5     that there came before me at the time, date, and place
     hereinbefore indicated, the witness named on the caption
6     sheet hereof, who was by me duly sworn to testify to the
     truth of said witness' knowledge touching and concerning
7     the matters in controversy in this cause; that the
     witness was thereupon examined under oath, the
8     examination taken down by me in shorthand, and later
     reduced to typewriting under my supervision and
9     direction, and that the deposition is a true record of
     the testimony given and of all objections interposed.

10

11         I further certify that I am neither attorney nor
     counsel for, or related to or employed by any of the
12     parties in the action in which this deposition is
     taken, and further that I am not a relative or employee
13     of any attorney or counsel employed by the parties
     hereto, or financially interested in the action.

14         Dated at Des Moines, Iowa, this 9th
     day of October, 2013.

15

16

17

18         _____
          Certified Shorthand Reporter
19          and Notary Public of the State of Iowa

20

21

22

23

24

25

Dear Clerk of court                                    4/12/2016

Would you please File this 1983,

                    Thank you                    **RECEIVED**

                                                 APR 18 2016

                                                 CLERK U.S. DISTRICT COURT
                                                 SOUTHERN DISTRICT OF IOWA

                    Spencer Pierce, 0800012
                    POX Box 316
                    FT. Madison Iowa 52627

$ 001.99°

NOTICE: This correspondence was mailed from an institution of the Iowa Department of Corrections.

Clerk U.S. District Court
P.O. Box 9344
Des Moines, IA
50306-9344

SCANNED & CLEARED BY U.S. MAIL

P.O. Box 316 ATY
Ft. Madison, IA
52627