IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| SPENCER PIERCE, SR., | |
| Plaintiff, | No. 4:16-cv-00115-JAJ-HCA |
| v. | |
| JERRY LOVEJOY, TRUDY SIMONSON, GERALD FISHER, LORNA GARCIA, JAMES ENTREKIN, MICHAEL MCTAGGERT, BRADY CARNEY, MATTHEW TOWERS, BRAD YOUNGBLUT, MARK PAULSON, JOHN P. SARCONE, MIKE ROTH, SECURUS TECHNOLOGY, REX SPARKS, AND JOHN DOE (VIDEO EDITOR), | **ORDER** |
| Defendants. | |

## I. BACKGROUND

Plaintiff Spencer Pierce, Sr., an inmate housed at the Iowa State Penitentiary, filed this action pro se pursuant to 42 U.S.C. § 1983. Pierce alleges the Defendants,[1] the majority of whom are law enforcement officers for the City of Des Moines, violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights while investigating and prosecuting him for charges of murder in the first degree and robbery in the first degree.

---

[1]Defendants Stephanie Cox, Daniel Vogt, and Mark Mohr were dismissed from the case on October 26, 2017. [Dkt. 20]. The remaining defendants are those named in Plaintiff's third amended complaint.

A jury convicted Plaintiff of both charges, but his convictions were overturned after the Iowa Court of Appeals determined the evidence was insufficient to convince a rational trier of fact of Pierce's guilt beyond a reasonable doubt. *State v. Pierce*, 868 N.W.2d 201 (Iowa Ct. App. 2015). Plaintiff's 42 U.S.C. § 1983 action asks for judgment in his favor and asks the Court to award compensatory and punitive damages.

Defendants Jerry Lovejoy, Trudy Simonson, Gerald Fisher, John Doe Video Editor, Lorna Garcia, James Entrekin, Michael McTaggart, Brady Carney, Matthew Towers, Brad Youngblut, and Mark Paulson ask for summary judgment, asserting the undisputed facts show the officers' actions were reasonable under the circumstances, they are entitled to qualified immunity, and the claims are barred by the legal doctrine of resjudicata and/or collateral estoppel. [Dkt. 30] Pierce resists the motion. [Dkt. 49, 50, 51, 52, 53, 54]. For the following reasons, the Court grants summary judgment in favor of the defendants listed above.

## II.  SUMMARY JUDGMENT STANDARD

The Court will grant summary judgment if, viewing the evidence in the light most favorable to the non-moving party there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing there is a genuine issue for trial.'" *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (quoting *Dahl v. Rice Cnty.*, 621 F.3d 740, 743 (8th Cir. 2010)).

To avoid an entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986). To show a fact is genuinely disputed, a party must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c) (1) (A) & (B).

The quantum of proof the nonmoving party must produce is not precisely measureable, but it must be enough evidence "such that a reasonable jury could return a verdict for the nonmovant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 1986); *see also Matshusita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) ("opponent must do more than simply show that there is some metaphysical doubt as to the material facts); *Williams v. City of Carl Junction*, 480 F. 3d 871, 873 (8th Cir. 2007)("the nonmoving party must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact or trial.") (internal quotations omitted)).

Plaintiff sets forth what he believes are specific and material disputed issues of fact. [Dkt. 49]. The Court considers all the facts in the record to see if a genuine issue of fact remains for trial as to any claim raised by Plaintiff.

### III. SUMMARY OF MATERIAL FACTS

Spencer Pierce was charged with various crimes all stemming from the investigation of the murder of Steven Harmon on or about June 6, 2013. The facts underlying the murder and robbery investigation and trial are set forth by the Iowa Court of Appeals in detail in *State v.*

*Hood*, 868 N.W.2d 201 (Iowa Ct. App. 2015)[2], and are summarized below.

Pierce and his co-defendant, Deanna Hood, shared an apartment at the time of the murder. *Id*. at *1. Hood previously had a romantic relationship with the victim, Steven Harmon. Harmon was a drug dealer. On June 5, 2013, Michelle Sanders and her boyfriend, Tracy Stone, went to Harmon's apartment in Des Moines to purchase one ounce of methamphetamine for $1700. *Id*. Sanders and Stone went to Harmon's apartment around 6:00 p.m. *Id*. It took some time to arrange the drug buy, and Sanders and Stone remained in Harmon's apartment for several hours, smoking methamphetamine. *Id*.

Hood and Pierce were also at Harmon's apartment on June 5. *Id*. Sanders overheard Hood and Harmon talking and believed they were discussing her proposed purchase drug purchase. Sanders believed Harmon was attempting to obtain the drugs from Hood to sell to her. Hood and Pierce left Harmon's apartment. Stone testified he saw Hood and Pierce leave in a gold Dodge Durango. *Id*.

Sanders and Stone left Harmon's apartment around 11:00 p.m., not yet having received the methamphetamine. *Id*. Harmon called them shortly after 11:00 p.m. and told them to come back because he was able to acquire the methamphetamine. Sanders gave Harmon $1700 to buy the methamphetamine. Harmon and his girlfriend Kimberly Frye left the apartment with Sanders' $1700.

Harmon and Frye drove to an industrial area ("Bindery 1") where semi-trailers were parked, and where Harmon stored property in a trailer. *Id*. at *2. Harmon and Frye arrived about 11:30 p.m.. While there, Harmon received a phone call and sent text messages from his

---

[2]Hood's convictions for first degree robbery and murder have not been overturned.

phone. After receiving a phone call, Harmon left the trailer. Frye stayed in the trailer and shortly afterwards  heard a vehicle pull up; she assumed the vehicle had arrived to complete the drug deal. *Id*. Frye heard a brief verbal exchange, and then heard two gunshots followed by car doors slamming and the vehicle driving away. After about twenty minutes Frye left the trailer, found Harmon's body lying on the ground, and went to get help. *Id*.

Frye directed the police to Bindery 1, where they found Harmon's body. *Id*. Later that morning, Bindery 1 employee Jason Bolen helped Detective Lorna Garcia retrieve surveillance videos from two DVR systems monitoring the camera systems for the area. *Id*. At 11:46 p.m., the videos showed Harmon's truck arrive and park next to his trailer. After Harmon's truck, the only other vehicle to enter the area was an SUV that arrived at 12:47 a.m. and which was on the property for approximately five minutes. The SUV stopped by the trailers and two people got out; the two people got back in the vehicle and drove away at 12:53 a.m. No other vehicles appeared in the videos until the police arrived. *Id*. The police determined that the SUV in the video was a Dodge Durango. *Id*.

Police obtained Hood's cell phone records which showed communication between her and Harmon immediately before the estimated time of the murder. *Id*. at *3. The records showed Hood and Harmon had phone exchanges beginning at 7:41 p.m. on June 5. Significantly, at 12:49 a.m., Hood called Harmon, the call connecting through a tower four blocks from Bindery 1. *Id*. Another call at 12:50 a.m. from Hood to Harmon again connected through the tower four blocks from the murder scene. The 12:50 a.m. call was the last call ever placed on Hood's phone *Id*.

Another witness, Bree Whipps, told police she had seen Hood and Pierce together at a

convenience store between 10:00 p.m. and 2:00 a.m. the night of the murder. Sometime in that time frame, Pierce drove Whipps to his uncle's house. At that time Pierce was driving a red Saturn car. *Id.* Detective Garcia reviewed surveillance videos from the convenience store; the videos show Hood and Pierce entering the store  and leaving a few minutes later but fail to reliably pinpoint the actual time Hood and Pierce were in the store. *Id.*

The factors set forth above raised concern Hood and Pierce were involved in the murder of Harmon. On June 7, 2013, a plain-clothes police officer observed Pierce driving a Dodge Durango into the apartment complex where Pierce and Hood lived. *Id.* The officer stopped Pierce, detectives impounded the Durango, and secured the apartment while they obtained a search warrant. *Id.*  During the search, officers found drug paraphernalia, packaging, a digital scale, and several baggies containing marijuana and methamphetamine, all consistent with distribution of drugs. *Id.* About one week after impounding the Durango, officers returned to the semi-trailer lot to created a "reenactment" video, driving the Durango on the same path as the vehicle in the surveillance video and comparing the two for similarities. Detective Brad Youngblut, who helped create the reenactment, testified the two vehicles appeared the same.

Several months after the initial seizure of the Durango, police searched the impounded Durango. "Under the air filter, they found a grocery sack containing six plastic baggies of methamphetamine, totaling 162 grams. Police were also able to identify this vehicle as the same vehicle that was captured on video the night of Harmon's murder." *Id.* The Durango was owned by Erlaly Anderson, a friend of Pierce's.

On August 23, 2013, Hood and Pierce were charged with first-degree murder, in violation of Iowa Code sections 707.1 and 707.2 (2013), and first-degree robbery, in violation of

Iowa Code sections 711.1 and 711.2, along with a dangerous weapon enhancement under section 902.7. *Id*. at *4. Prior to trial, Pierce and Hood filed a joint motion in limine requesting the drug and distribution evidence found in the apartment and the Durango, as well as the reenactment videos, be excluded; the district court denied the motion. *Id*. The court admitted the reenactment videos into evidence. *Id*. On November 6, 2013, the jury returned a verdict of guilty as to both counts for both defendants. *Id***.**

Pierce appealed his convictions for murder in the first degree and robbery in the first degree. The Iowa Court of Appeals found the evidence insufficient to convince a rational trier of fact of Pierce's guilt beyond a reasonable doubt, and vacated the sentences. *Pierce*, 868 N.W.2d 201.

At the same time Pierce was arrested for the murder and robbery of Harmon, however, he was also charged with a felony drug offense. [App. to Def.'s Mot. For Summ. J., ECF No. 30-3, 74-75]. On or about December 9, 2013, Pierce pled guilty to the charge of possession of a controlled substance (methamphetamine) with the intent to manufacture or deliver under Iowa Code 124.401(1)(b), a Class B felony with a term of up to 25 years of confinement. *Id*. at 107. He remains incarcerated for this crime.

### IV. CLAIMS FOR RELIEF

Plaintiff's third amended complaint [Dkt. 32, at 6] alleges his Fourth, Fifth, Sixth, and Fourteenth Amendment rights were violated by the defendants in knowingly, deliberately, and with reckless disregard for the truth submitting false statements or omissions that created a falsehood in applying for a warrant. He contends the false statements or omissions were material to the finding of probable cause. Pierce contends the defendants violated his right to due process

by continuing to question him and that the defendants' actions were intentional, reckless, willful, malicious, and constitute a flagrant disregard for his rights.

More specifically, Pierce alleges his rights were violated: (1) by his initial arrest and detention, without a warrant or probable cause, including the search of his apartment and the Durango he had been driving; (2) by the police continuing to question him after he asserted his right to counsel; (3) by the Defendants' conspiracy to create a false video of his Durango in an attempt to implicate him in the murder; (4) by the planting of evidence in the Durango by Defendants Brady and Carney; and (4) by Defendant Youngblut and Mike Roth's questioning Ms. Anderson about the murder and intimidating her so that she would not testify in his favor.

Defendants seek summary judgment because the undisputed facts show there was no Fourth Amendment violation, the officers' actions were reasonable under the circumstances, they are entitled to qualified immunity, and the doctrines of collateral estoppel and *Heck* bar the claims for relief.

## V. ANALYSIS

### A. Fourth Amendment

Plaintiff seeks money damages from law enforcement officers for their actions in detaining him, questioning him, using his cell phone, impounding his car, and searching his apartment. He contends the defendants' actions violated his Fourth Amendment rights.

"The Constitution does not guarantee that only the guilty will be arrested. If it did,§ 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Johnson v. Crooks*, 326 F.3d 995, 999 (8th Cir. 2003) quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979). "The Fourth Amendment prohibits 'unreasonable searches and

seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir.2007). In such a case, "officer[s] may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion." *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir.2008).

"[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.' "*Arvizu*, 534 U.S. at 273. Courts consider the "totality of the circumstances of each case to determine whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id*. (Internal quotations omitted). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir.2004).

A police officer may arrest a person, without a warrant, if the officer has probable cause to believe the person has committed a crime. *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014). Suspicion rises to the level of probable cause "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Ulrich v. Pope Cnty*., 715 F.3d 1054, 1059 (8th Cir.2013).

Even if a police officer does not, in fact, have probable cause to arrest a suspect, he is

entitled to qualified immunity from civil damage liability if there was "arguable" probable cause—that is, if he reasonably (but wrongly) believes that probable cause exists. "In the wrongful arrest context, officers are entitled to qualified immunity 'if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable.' " *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir.2010) (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir.2008)). Officers are protected by qualified immunity on claims of false statements regarding a warrant application unless Plaintiff submits probative evidence that the warrant affidavit contained deliberate falsehoods or a reckless disregard of the truth, and an affidavit "supplemented by the omitted information, would not have been sufficient to support a finding of probable cause." *Riehm v. Engelking*, 538 F.3d 952, 966 (8th Cir.2008).

The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quotation omitted). "To avoid pretrial dismissal, a plaintiff must present facts showing the violation of a constitutional right that was clearly established at the time of the defendant's act." *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017), reh'g denied (June 5, 2017), cert. denied, 138 S. Ct. 737 (2018). "When there is no dispute among the parties as to the relevant facts ... a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity." *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir.2000).

Plaintiff challenges the actions of the defendants in detaining him, questioning him, impounding his car, and searching his apartment. At the time police initially detained Pierce at the parking lot of his apartment building, the officers had probable cause to believe that Pierce

was connected to criminal activity. The officers had reason to believe: (1) Pierce and Hood were at Harmon's apartment the night of the murder, (2) they were driving a Dodge Durango, (3) Hood had been in frequent phone contact with Harmon until the time of the murder, (4) a light colored SUV, similar to a Dodge Durango, was seen on surveillance tapes at the murder scene, and (5) Pierce was again driving a Dodge Durango when he returned to the apartment he shared with Hood.

Police had ample suspicion to stop and question Pierce in the parking lot of his apartment, and to detain him while they obtained a warrant to search the apartment. Once inside the apartment building, Pierce yelled "Flush the weed!" to whoever was inside, giving police further cause to enter the apartment and secure the premises while they waited for a warrant to issue. The totality of the circumstances at the time of Pierce's detention were sufficient to lead a reasonable person to believe that the defendant had committed or was committing an offense. *See*, *e.g.*, *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010).

Pierce contends the defendants violated his Fourth Amendment rights by seizing his apartment keys and using his cell phone to attempt to call Deanna Hood. [Dkt. 49]. A warrantless search of a cell phone may violate the Fourth Amendment. *Riley v. California*, 134 S.Ct. 2473 (2014). Exceptions to the general rule requiring a warrant exist (like the need to prevent destruction of evidence or to pursue a fleeing suspect) and may justify a warrantless search of a particular phone. *Id.* When the exigencies of the situation make the needs of law enforcement compelling, a warrantless search is objectively reasonable under the Fourth Amendment. *Id.* Investigating officers may also, consistent with the Fourth Amendment, conduct a warrantless search of a parolee's phone. *United States v. Jackson*, 866 F.3d 982 (8th Cir.

2017).

Pierce was on parole when he was detained by the officers in this case. [Dkt.81-1]. The use of his phone was limited in scope. The law regarding officers' right to search a cell phone was evolving. The officers are entitled to qualified immunity for Pierce's allegation use of his cell phone violated the Fourth Amendment.

The considerations outlined above also justify the officers' use of Pierce's key to enter the interior of the apartment building. The police had probable cause to believe Hood and Pierce were involved in a crime. Hood's whereabouts were unknown and there was potential for destruction of evidence. The record shows no Fourth Amendment violation sufficient to withstand the officers' entitlement to qualified immunity.

## B. Heck Bar/Collateral Estoppel

Although Plaintiff's convictions for murder and robbery were overturned, they were overturned because the Iowa Court of Appeals determined insufficient evidence supported the verdicts. The Iowa Court of Appeals made no determination any of the evidence submitted during the trial was obtained in violation of Plaintiff's rights. Plaintiff's conviction for the felony drug charges stands, and rulings in that legal proceeding bar many of his current claims.

### 1. Collateral Estoppel

"Collateral estoppel generally bars a plaintiff from relitigating in a suit under 42 U.S.C. § 1983 an issue that was decided against him in earlier state proceedings." *Simpson v. Rowan*, 125 F. App'x 720, 721 (7th Cir. 2005) (collateral estoppel barred action, since defendant had full and fair opportunity to litigate Fourth Amendment issue via his motion to suppress). Collateral estoppel is applied according to the law of the state whose court rendered the prior decision. *See*

*Allen v. McCurry*, 449 U.S. 90, 96 (1980). Issue preclusion, sometimes referred to as collateral estoppel, is a form of res judicata that prevents parties from relitigating issues raised and resolved in prior legal proceeding. *Employers Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012) (discussing preclusive effect of an *Alford* plea).

In Iowa, the party invoking issue preclusion "must establish four elements:  (1) the issue in the present case must be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue must have been material and relevant to the disposition of the prior case, and (4) the determination of the issue in the prior action must have been essential to the resulting judgment." *Id*. (internal citations omitted).

Plaintiff challenges the validity of the searches of his vehicle and his apartment. During those searches, drugs were located. Plaintiff later pled guilty to possession of narcotics with intent to deliver and with a parole violation, all related to drugs found in his apartment and his vehicle. Plaintiff contested the legality of the searches of his vehicle in a motion to suppress filed in Case No. FECR 269461. [Dkt. 30-3, 492-93]. In that motion to suppress, Pierce alleged the statements made by the officers in support of the search warrants were inconsistent with later testimony by the officers. The Honorable Judge Robert A. Hutchison found no evidence that any of the statements by any officers in support of the warrant application were the result of deliberate falsehood or reckless disregard for the truth. *Id*. For that reason and other reasons, he denied the motion to suppress evidence obtained in both the search of the vehicle on August 20, 2013, and the search of the vehicle pursuant to a warrant issued June 7, 2013. *Id*.

The order denying the motion to suppress was filed on December 6, 2013. On or about December 9, 2013, Pierce pled guilty to the charge of possession of a controlled substance

(methamphetamine) with the intent to manufacture or deliver under Iowa Code 124.401(1)(b), a Class B felony with a term of up to 25 years of confinement. [Dkt. 30-3, 107]. [3]

Plaintiff also raised challenges to his initial detention and the subsequent searches in a postconviction relief petition challenging his drug conviction. [Rul'g on Appl. For Postconviction Rel'f., Dkt. 78-2]. The Court found no evidence of any intentional falsehoods in the search warrants. *Id*. at 8-9. The Court denied the petition, which raised many of the issues raised in this case.

In this case, Defendants meet all four elements for application of collateral estoppel for at least some of the claims Pierce raises now: the issue is identical, it was raised and litigated in the prior trial, the issue was material and relevant to the disposition of the case, and the determination of the issue was essential to the resulting judgment. Pierce is therefore prevented from relitigating the issue he raised in state court in support of his motion to suppress, the validity of the search of the Durango for drugs. Any claim for damages stemming from what he contends was an invalid search, or from deliberate falsehoods in the warrant applications, is therefore barred.

### 2. *Heck Bar*

Pierce's claims for relief are further restricted by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). In *Heck*, the Supreme Court held that a section 1983 action should be dismissed if a

---

[3]Pierce contends he pled guilty to a drug charge based on drugs found inside his apartment, not drugs founds within the Durango. Pierce pled guilty to drug charges three days after his motion to suppress evidence found in the Durango was denied. The Court finds the drug cases so intertwined the *Heck* bar applies. *See* Postconviction Ruling, *Pierce v. Iowa*, No. PCCE 0754 [Dkt. 78-2] (addressing Pierce's negotiated plea deal and Pierce's challenges to all searches as related issues).

judgment "would necessarily imply the invalidity of [a plaintiff's] conviction or sentence," unless the conviction or sentence was reversed, expunged, declared invalid, or called into question. *Id. Heck* does not bar all claims related to an investigation resulting in a conviction. For example, "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction." *Id*. at n. 7.

*Heck* precludes Pierce from raising, however, any claim that would necessarily imply the invalidity of his felony drug conviction. *See, e.g.*, *Williams v. Schario*, 93 F.3d 527, 529 (8th Cir.1996) (per curiam) (false testimony and malicious prosecution claims are Heck-barred where they necessarily imply invalidity of conviction or sentence); *Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir.1996) (per curiam) (Heck barred claims that police officers lacked probable cause for arrest and brought unfounded criminal charges); *Gautreaux v. Sanders*, 395 F. App'x 311, 312 (8th Cir. 2010) (claim of invalid arrest warrant and claim that records had been altered in order to convict him are Heck-barred).

Pierce pled guilty after his motions to suppress drugs found in his vehicle were denied. He contends Defendants planted drugs in the vehicle. The claim that Defendants planted the drugs necessarily implies the invalidity  of his outstanding drug conviction and is barred by *Heck. See, e.g.,  Moore v. Sims*, 200 F.3d 1170 (8th Cir. 2000).

### C. Improper Interrogation

Pierce seeks money damages against Defendants because he alleges they continued to question him even after he asked for his attorney, in violation of rights established by *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.  Even if Pierce could show his *Miranda* rights

were violated by questioning by the police, which they deny, Pierce's exclusive remedy would be a suppression of the statements during any ensuing criminal proceeding. *Hannon v. Sanner*, 441 F.3d 635 (8th Cir. 2006). Under existing Eighth Circuit law, section 1983 does not provide a remedy for a violation of *Miranda. Id.*

### D. Fabricated Evidence

Pierce challenges Defendants' actions in seizing the Durango and using it to create a "reenactment" video. He contends use of the Durango for that purpose destroyed potentially exculpatory evidence, and that the video ultimately created was false and misleading. He contends the surveillance and reenactment videos were altered to make it more likely to look like his vehicle was the same vehicle in the surveillance video. He contends Defendants falsely testified his vehicle matched the vehicle in the surveillance video, and that Defendant Youngblut falsely testified he could tell the vehicles were the same because of a distinctive hitch. In fact, the hitch was not placed on Pierce's Durango until shortly after the murder, and would therefore not have been on the vehicle at the time of the murder.[4] Pierce contends the reenactment video shows no interior lights; his vehicle has functioning interior lights.

"[A] manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant." *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012). *See also*, *Riddle v. Riepe*, 866 F.3d 943, 947 (8th Cir. 2017). Pierce fails to support his claim of manufactured evidence sufficient for a reasonable jury to find in his favor.

---

[4]Defendant Youngblut conceded in his deposition that he incorrectly testified during Pierce's preliminary hearing that a hitch was visible on the SUV in the surveillance video. In later testimony he clarified the hitch was on the vehicle in the reenactment video, but not in the surveillance video. He testified he had watched both videos multiple times and mistakenly identified the hitch as being on in the surveillance video.

He submitted dvds to the Court which he claims support his theory, but the dvds submitted to the Court, other than the sixth dvd, do not relate to his case. The surveillance and reenactment videos were contested at the criminal trial, and the court found the videos admissible at trial. [Def.'s Mot. For Summ. J., App., Tr. Trans., ECF No. 30-3, 152]. This claim fails.

### E. Conspiracy Claim

Pierce's civil conspiracy claim is based on the same facts as those offered to support his fabrication of evidence claim. "To prevail on a § 1983 conspiracy claim, a plaintiff is 'required to prove a deprivation of a constitutional right or privilege.'" *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). In the absence of proof of a constitutional violation, there is no actionable conspiracy claim. *Riddle v. Riepe*, 866 F.3d 943, 948–49 (8th Cir. 2017).

### E. Claims Against Each Defendant

As set forth above, the Court finds Plaintiff has failed to raise sufficient evidence to withstand Defendants' motion for summary judgment. In doing so, the Court addressed the claims by category. For clarity, the Court now outlines the claims as to each defendant.

#### 1. Jerry Lovejoy

Pierce alleges Lovejoy was one of the officers who initially detained him in his parking lot on June 7, 2013. He contends Lovejoy, Paulson and Fisher took his car keys and accessed the secured door to Pierce's apartment building. He alleges Lovejoy was one of the officers who searched his apartment without a warrant or probable cause and took Pierce's driver's license and other personal items. He alleges Lovejoy deliberately omitted exculpatory facts from his police report and deposition with the intent of denying him due process. The claims against Lovejoy fail for all the reasons set forth above.

*2.Trudy Simonson*

Pierce alleges on June 7, 2013. Simonson searched Plaintiff, took his phone, keys, handcuffed him, and put him in a police van, while repeatedly asking him where Deanna Hood was. He alleges Simonson continued to interrogate him even though he repeatedly requested to speak with a lawyer. He alleges Simonson without probable cause forced Plaintiff from the parking lot into Plaintiff's apartment building, while continuing to interrogate him. He alleges Simonson searched his apartment without a warrant or probable cause, and took his license and personal items. He alleges Simonson drove Pierce to the police station without probable cause and deliberately omitted exculpatory facts from a police report with the intent to deny him due process. The claims against Simonson fail for all the reasons set forth above.

*3. Gerald Fisher*

Pierce alleges Fisher is one of the officers who took his keys and accessed the secured door to his apartment building. The claims against Lovejoy fail for all the reasons set forth above.

*4. John Doe Video Editor*

Pierce alleges John Doe Video editor edited the reenactment video with the intent of editing out all the exculpatory video footage, and with the intent of fabricating the video footage to convict Plaintiff of murder and other crimes. The claims against John Doe Video Editor fail for all the reasons set forth above.

*5. Lorna Garcia*

Pierce alleges defendant Garcia prepared an application for a search warrant of plaintiff's apartment and Dodge Durango. He alleges the defendants put Franks violations in the

application by lying and omitting exculpatory facts. He alleges Garcia lied in the police report and deposition testimony with the intention of denying him due process. The claims against Garcia fail for all the reasons set forth above.

### 6. James Entrekin

Pierce alleges defendant Entrekin prepared an application for a search warrant of plaintiff's apartment and Dodge Durango. He alleges the defendants put Franks violations in the application by lying and omitting exculpatory facts. He alleges Entrekin used Plaintiff's vehicle without a warrant to make a video, knowing use of the Durango could cause destruction of potentially exculpatory evidence. He alleges the Entrekin and other defendants came to a meeting of the minds to testify falsely that the Durango is the same Durango in the Bindery 1 surveillance video. The claims against Entrekin fail for all the reasons set forth above.

### 7. Michael McTaggart

Pierce alleges McTaggert lied in his police report and deposition testimony with the intention of denying him due process. He alleges Mctaggert fabricated conspired to fabricate evidence against Pierce in order to create probable cause to arrest Pierce for murder and other crimes, and McTaggert used Plaintiff's Durnago without a warrant to make a video knowing use of the Durango could cause destruction of potentially exculpatory evidence. He alleges the McTaggert and other defendants came to a meeting of the minds to testify falsely that the Durango is the same Durango in the Bindery 1 surveillance video. The claims against McTaggart fail for all the reasons set forth above.

### 8. Brady Carney

Pierce alleges Defendant Carney prepared an application for a search warrant of

Plaintiff's apartment and Durango and put Franks violations in the warrant application by lying and omitting exculpatory facts. Pierce alleges Carney lied in his police report and eposition testimony with the intention of denying Plaintiff due process. He alleges Carney planted drugs in Plaintiff's Dodge Durango. The claims against Carney fail for all the reasons set forth above.

### 9. Matthew Towers

Pierce alleges Defendant Towers arrived at the parking lot and ignored Plaintiff's request for an attorney and continued to interrogate him. He alleges Towers told him he would charge him with interference if he did not answer questions. He alleges Towers and other offices forced Plaintiff from the parking lot to the apartment building without probable cause., and then searched his apartment without a warrant or probable cause. He alleged Towers filed an arrest warrant which contained false statements with the intent to violate Pierce's parole, to cover up the lack of probable cause by making it look like Pierce gave permission to go inside. In the interview room, Pierce contends Towers continued to interrogate him despite his request for an attorney. The claims against Towers fail for all the reasons set forth above.

### 10. Brad Youngblut

Pierce alleges Brad Youngblut arrived at the parking lot and ignored Plaintiff's request for an attorney and continued to interrogate him. He alleges Youngblut took his phone to try to call Deanna Hood. He alleges Youngblut and other offices forced Plaintiff from the parking lot to the apartment building without probable cause., and then searched his apartment without a warrant or probable cause. He alleged Youngblut filed an arrest warrant which contained false statements with the intent to violate Pierce's parole, to cover up the lack of probable cause by making it look like Pierce gave permission to go inside. In the interview room, Pierce contends

Youngblut continued to interrogate him despite his request for an attorney. He alleges Youngblut lied in police reports and depositions with the intention of denying Pierce due process.Pierce alleges Youngblut conspired to fabricate evidence against Pierce in order to create probable cause to charge Pierce with murder and other crimes. He alleges Youngblut used his Durango to make a video, knowing the useage could destroy potential exculpatory evidence, and that Youngbut came to a meeting of the minds with other defendants to testify falsely that the Durango was the same SUV in the Bindery 1 surveillance video, and to withhold the name of the video editor so Plaintiff could not depose him. He alleges Youngblut harassed the owner of the Durango by giving her the choice to answer questions about the murder or go to jail for driving on a suspended license. He alleges Youngblut gave false testimony at his preliminary hearing in order to create probable cause. Youngblut testified that the drug unit did tow buys with Pierce's co-defendant and also testified he could identify the SUV by the way it drove over bumps. He also testified he could identify the hitch on the Durango, when in fact the Durango did not have a hitch at the time the video was made. He alleges Youngblut planted drugs in the Durango.

The claims against Youngblut fail for all the reasons set forth above.

*11. Mark Paulson*

Pierce alleges Paulson was at the parking lot when Pierce was detained. He alleges Paulson took plaintiff's keys and accessed the secure door of the apartment. The claims against Paulson fail for all the reasons set forth above.

**VI. CONCLUSION**

For the foregoing reasons, Defendants Lovejoy, Simonson, Fisher, John Doe Video Editor, Lorna Garcia, James, Enterkin, Michael McTaggart, Brady Carney, Matthew Towers,

Brad Youngblut, and Mark Paulson's Motion for Summary Judgment [Dkt. 30] is **granted.** The Defendants listed above are dismissed from the case. The Motions for Summary Judgement filed by Defendants Sarcone and Securus Technology will be addressed in separate orders.

**IT IS SO ORDERED**.

**DATED** this 17th day of September, 2018.

JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA